IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GUY R. MARTINO, | ) |
|       Plaintiff, | ) |
| v. | ) No. 07 C 2627 |
| MCI COMMUNICATIONS SERVICES, INC., d/b/a VERIZON BUSINESS SERVICES, a Delaware Corporation, | ) |
|       Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In his five-count Amended Complaint, Plaintiff Guy R. Martino ("Martino") alleges violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, as well as state law claims of breach of contract, promissory estoppel, unjust enrichment, and a claim under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*, against Defendant Verizon Business Network Services, Inc. ("Verizon Business"). Before the Court is Verizon Business' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants Verizon Business' summary judgment motion as to Martino's ADEA claim. The Court declines to exercise its supplemental jurisdiction over Martino's state law claims and dismisses these claims without prejudice. *See* 28 U.S.C. § 1367(c)(3).

## BACKGROUND

### I.   Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts

from the parties' Local Rule 56.1 statements. Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004). Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.,* 403 F.3d 940, 944 (7th Cir. 2005). The parties' Local Rule 56.1 statements must contain short numbered paragraphs, including references to the affidavits, parts of the record, and other supporting materials. *See id.; see also Ammons,* 368 F.3d at 817.

The purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006). The requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon,* 233 F.3d at 528. A litigant's failure to respond to a Local Rule 56.1 statement results in the Court admitting the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Moreover, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., L.L.C.* 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider

2

the additional facts that a litigant has proposed"); *see also Raymond,* 442 F.3d at 604 ("district courts are entitled to expect strict compliance with Local Rule 56.1"). With these standards in mind, the Court turns to the relevant facts of this case.

## II.    Relevant Facts

### A.    Parties

Verizon Business is a subsidiary of Verizon Communications, Inc., which is a worldwide telecommunications company. (R. 47-1, Def.'s Rule 56.1 Stmt. Facts ¶ 2.) Verizon Business was formed following a merger between MCI Communications and Verizon Communications on January 6, 2006. (*Id*.) In late 2004, Martino, who was born on July 16, 1950, applied for an open position at MCI Network Services, Inc. (*Id*. ¶¶ 1, 4.) After receiving and accepting an offer as a Business Solutions Consultant ("BSC"), Martino began working for MCI's Enterprise Hosting and Data Services Group on February 9, 2005. (*Id*. ¶¶ 4, 5.)

### B.    Martino's Employment and Job Duties

During his employment, Martino reported to Robert Gross, who was the Regional Sales Director for the Midwest Region. (*Id*. ¶ 6.) As a BSC, Martino served as a product-knowledge or service-knowledge specialist for hosting and hosting-related products and services. (*Id*. ¶ 9.) Throughout his tenure, Martino was assigned to core sales teams because his position was considered an "overlay" position – he overlaid and assisted the core sales teams that handled the named accounts. (*Id*. ¶¶ 10, 11; R. 50-1, Pl.'s Rule 56.1 Stmt. ¶ 1.) A core sales representative – not a BSC – would "quarterback" the entire sales process, owned the client relationship, and owned all of the components that made up the sales process. (Def.'s Stmt. Facts ¶ 11.) As a sales representative in the IT Hosting Solutions Division, Martino was responsible for selling a

3

"full suite of services," which included managed hosting, Akamai services (web application services), data center services, e-mail services, application management, IT services help desk, remote backup and restore, and mainframe outsourcing to the premier accounts in the hosting division. (*Id.* ¶ 12; Pl.'s Stmt. Facts ¶ 2.) In return for providing services during his employment, Martino received a salary, commissions, and benefits, as well as expenses. (Def.'s Stmt. Facts ¶ 7.)

      C.     **The BP Amoco Deal**

In mid-2005, Verizon Business formed a sales team to secure business from BP Amoco regarding a data center collocation opportunity. (*Id.* ¶ 13.) Martino was part of the team because he was the BSC in the IT Hosting Solutions Division that "overlaid" the core sales branch responsible for the BP Amoco deal. (*Id.*) David Schiffman was the core sales representative principally responsible for the BP Amoco deal. (*Id.* ¶ 15.) Steve Rumstein, the Director of IT Hosting Solutions, also played an important role in the BP Amoco deal. (*Id.* ¶ 17.) Ultimately, BP Amoco and Verizon Business signed a contract in October 2005. (*Id.* ¶ 20.)

While attempting to secure BP Amoco's business, Verizon Business had to respond to BP Amoco's request for proposal ("RFP"). (*Id.* ¶ 14.) The RFP process is a formal process where members of a sales team sit in a conference room, read through the pages of the RFP, and formulate a response. (*Id.*) One of the "major initiatives" expected of a BSC at Verizon Business is to assist the core sales team in the RFP process. (*Id.*) At his deposition, Rumstein testified that Martino did not play a significant role in landing the BP Amoco deal. (*Id.* ¶ 18, Ex. D, Rumstein Dep., at 34-35.) Rumstein specifically testified that Martino did not get involved

4

with the cores sales team during the RFP process for the BP Amoco deal.  (*Id.*, Ex. D, Rumstein Dep., at 35.)  Further, Rumstein testified that he expected a BSC to take a much stronger leadership role in driving the RFP process than Martino took on the BP Amoco deal.  (*Id.*, Ex. D., Rumstein Dep., at 40.)

### D. Martino's Sales and Performance Evaluation

Under Martino's compensation policies in 2005 and 2006, he was eligible to receive commissions on sales in accounts assigned in his territory – regardless of the amount of work he performed in securing those accounts.  (*Id.* ¶ 21.)  As discussed, during this time period, Martino was the hosting sales representative who overlaid the core sales branch that secured the BP Amoco business.  Therefore, Martino received qualified sales credits from the BP Amoco deal.  (*Id.* ¶ 22.)  Specifically, Martino received credit for three qualified sales resulting from the BP Amoco deal in 2005, including $324,945 in October 2005, $1,630 in November 2005, and $2,616 in December 2005.  (*Id.* ¶ 24.)  Martino, however, did not reach his monthly sales quota for the majority of 2005.  (*Id.* ¶ 23.)  In 2006, the vast majority of Martino's qualified monthly sales were a result of the BP Amoco deal.  (*Id.* ¶ 26; Ex. K, June 2006, Commissions Related Revenue Report.)

In or around February 2006, Gross evaluated Martino's job performance for 2005.  (*Id*. ¶ 29.)  Gross gave Martino an "improvement required" rating in the Post-Sale Activity/Retention category on the written evaluation and commented that "I would like to see improvement in the follow-up with [Martino's] supported teams during and after turn-up environments."  (*Id*.)  Gross based his "improvement required" rating on Rumstein's and Schiffman's input.  (*Id*.)  Otherwise, Martino received "meeting expectations" in the remaining categories of his written review.

5

(Pl.'s Stmt. Facts ¶ 6.)

### E. Changes at Verizon Business

Following the merger of MCI and Verizon Business in January 2006, Verizon Business decided to reduce the costs associated with headcount in the specialized services division.[1] (*Id.* ¶ 34.) In June 2006, Ron McMurtrie, the Vice President of Specialized Services, informed Ed Franklin, the Vice President of IT Solutions, that a reduction-in-force ("RIF") was to take place to achieve the goal of reducing costs. (*Id.* ¶ 35.) McMurtrie instructed Franklin that he had to reduce the headcount within the IT Services Division by approximately 35 people. (*Id.*)

Before the RIF, BSCs in the IT Hosting Solutions Division were responsible for selling both basic collocation services and more complex managed hosting services, as well as being primarily responsible for supporting the core sales teams in their territories. (*Id.* ¶ 36.) At the time of the RIF, Verizon Business planned to change the BSC position in the IT Hosting Solutions Division going forward.[2] (*Id.* ¶ 37.) First, the BSCs would be responsible for taking a more active role in the sales process. (*Id.*) Second, the BSCs would no longer be responsible – or receive commissions or credit – for selling basic collocation services. (*Id.*) Instead, BSCs would be responsible for selling more complex managed hosting solutions. (*Id.*)

### F. Martino's Discharge from Verizon Business

---

[1] Despite Plaintiff's argument to the contrary, the Vice President of IT Services, Ed Franklin, did not base Defendants' Rule 56.1 Statement ¶ 34 on "flights of fancy, speculation, hunches, intuitions or rumors." *See Hartman v. Pena,* 914 F.Supp. 225, 231 (N.D. Ill. 1995). (*See* Def.'s Stmt. Facts, Ex. M, Franklin Decl. ¶¶ 3-6.)

[2] Plaintiff denies this statement, but fails to satisfy the requirements under Local Rule 56.1 as to Defendant's Statement of Fact ¶ 37 because his denial does not "fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).

In June 2006, Franklin and Fran Snyder, the Business Manager of IT Services, asked Rumstein to create and submit a list for the RIF consisting of individuals who would contribute least to Verizon Business going forward. (*Id*. ¶¶ 38, 39.) Rumstein considered a number of factors in determining which BSCs to place on the list, including geographic coverage, the BSC's ability to sell Verizon Business' complete product portfolio, the BSC's credibility with the core sales organization, the BSC's past ability to sell across multiple services, and the BSC's actual sales performance. (*Id*. ¶ 40.) At his deposition, Rumstein explained that despite Martino's high sales numbers from the BP Amoco deal, he put Martino on the RIF list because Martino had not demonstrated past success in selling managed services. (*Id.* ¶ 41, Ex. D, Rumstein Dep, at 74-75.) Specifically, Rumstein testified that Martino was not performing "based on the expectations we had at IT solutions to sell multiple services." (*Id*., Ex. D, Rumstein Dep., at 77.)

After Rumstein created the short list, he submitted it to Snyder on June 15, 2006. (*Id*. ¶ 43.) Ultimately, Franklin reviewed the RIF short list and decided to terminate Martino's employment. (*Id.* ¶ 44.) Specifically, Franklin averred that although Martino's qualified sales numbers were very good, the majority of his sales were due to the BP Amoco deal and that Martino did not participate in the BP Amoco deal in a meaningful way. (*Id*., Ex. M, Franklin Dec. ¶ 7.) Franklin also averred that Martino's track record as a BSC suggested that he had a limited ability to sell managed services and that the majority of his qualified sales consisted of basic collocation services. (*Id*.)

Verizon Business discharged Martino effective on July 14, 2006. (*Id*. ¶ 46.) On February 2, 2007, Martino filed an EEOC Charge of unlawful discrimination in violation of the

Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (*Id.* ¶ 47.) The EEOC issued a right-to-sue letter to Martino on April 27, 2007. (*Id.*) On May 9, 2007, Martino filed his original complaint in the district court. (R. 1-1.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## ANALYSIS

**I.    ADEA Claim**

In Count I of his Amended Complaint, Martino alleges that Verizon Business discriminated against him based on his age, which was two days short of 56 at the time of his discharge. "The ADEA seeks to protect those over the age of forty from age discrimination in

the workplace." *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 517 F.3d 470, 473 (7th Cir. 2008). Under the ADEA, Martino may prove intentional discrimination by using either the direct or indirect method of proof as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *See Tubergen,* 517 F.3d at 473; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006). Martino maintains that he can establish unlawful age discrimination under both methods of proof.

### A. Direct Method

Under the direct method of proving intentional discrimination, a plaintiff is required to set forth "direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Tubergen,* 517 F.3d at 473 (citation omitted). More specifically, "[d]irect evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption" and "[c]ircumstantial evidence of discrimination is evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Nichols v. Southern Ill. Univ. – Edwardsville,* 510 F.3d 772, 781 (7th Cir. 2007) (citation omitted). "[C]ircumstantial evidence must point directly to a discriminatory reason for the termination decision." *Ptasznik,* 464 F.3d at 695; *see also Atanus v. Perry,* ___ F.3d ___, 2008 WL 696908 (7th Cir. Mar. 17, 2008).

Because there is no direct evidence in the record that Verizon Business made an admission that it discharged Martino based on his age, the Court turns to whether Martino has provided sufficient circumstantial evidence that demonstrates a genuine issue of material fact for trial. *See Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007).

### 1. Remarks About Martino's Age

9

Martino contends that his supervisor, Gross, called him an "oldtimer" during his employment with Verizon Business. Martino also asserts that Brian Higley, who was the Sales Director of the Chicago Suburban Branch of Corporate Accounts, told him that he was "too senior" and "too old" for available sales positions on his team.[3]

Isolated or stray remarks are normally insufficient to establish that an employer was motivated by unlawful discrimination under the direct method of proof. *Id.*; *see also Sun v. Board of Trs. of Univ. of Ill.,* 473 F.3d 799, 813 (7th Cir. 2007). "[A] particular remark can provide an inference of discrimination when the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth,* 476 F.3d at 491. Moreover, "statements of a person who lacks the final decision-making authority may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision." *Sun,* 473 F.3d at 813.

### a. Gross' Remarks

First, Martino argues that Gross, his direct supervisor, referred to him as an "oldtimer." It is undisputed that Gross did not decide to terminate Martino's employment. Moreover, viewing the facts in Martino's favor, he does not present evidence that Gross called him an "oldtimer" around the time that Rumstein put Martino on the RIF short list or Martino's subesquent discharge. *See Hemsworth*, 476 F.3d at 491. Also, there is no evidence in the record

---

[3] Martino also maintains that Higley and unnamed co-workers "routinely made ageist remarks" showing that "Defendant fostered a pervasive age bias[ed] environment." (R. 49-1, Pl.'s Resp. Brief, at 5.) Martino, however, makes no further arguments supporting a hostile work environment claim. *See Roe-Midgett v. CC Servs., Inc.,* 512 F.3d 865, 876 (7th Cir. 2008) (undeveloped argument constitutes waiver). In fact, Martino did not bring a hostile work environment claim in his EEOC Charge or in the Amended Complaint.

that Gross' remarks were made in reference to Martino's discharge. *See id.*

Martino nevertheless argues that because Gross conferred with Rumstein about the BP Amoco deal and Martino's performance evaluation and that Rumstein decided to put Martino on the RIF short list, Gross' alleged statements are imputed to Rumstein. Martino's attempt to link Gross to Rumstein's decision to put Marino on the RIF short list is too attenuated to allow an inference of intentional discrimination by Rumstein or Franklin, the ultimate decision maker. *See Nichols,* 510 F.3d at 781; *see also Ptasznik,* 464 F.3d at 695 (circumstantial evidence must "point directly to a discriminatory reason for the termination decision."). As the Seventh Circuit instructs, "when the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Sun,* 473 F.3d at 813 (citation omitted). Here, the RIF involved several layers of review, which included Franklin's review of Rumstein's short list and Franklin's ultimate decision to terminate Martino. Thus, Martino's argument based on Gross' remarks fail because the remarks were not connected to Martino's discharge.

        **b.**        **Higley's Remarks**

Martino also argues that the Sales Director of the Chicago Suburban Branch of Corporate Accounts, Brian Higley, told him that he was "too senior" and "too old" for positions available on Higley's team. Martino explains that although Higley was not his boss at the time he was terminated, he sought a position on Higley's team as a Sales Manager or Corporate Account Manager position after his termination in July 2006. Verizon Business addresses Martino's arguments about Higley in its response to Martino's Rule 56.1 Statements, which contradicts the

Local Rules. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) (purpose of Rule 56.1 statements is to identify the relevant evidence – not to make legal arguments).

Nonetheless, the Court notes that Martino did not bring a failure to re-hire claim in his Amended Complaint nor did Martino mention any such claim in his EEOC Charge. (R. 27-2, Am. Compl., Ex. 1.) Instead, Martino brought a wrongful termination claim against Verizon Business. (*Id*. ¶¶ 10-18.) Therefore, Martino's failure to re-hire claim fails because it is beyond the scope of his EEOC Charge and was not alleged in his Amended Complaint. *See Ritter v. Hill 'N Dale Farm, Inc.,* 231 F.3d 1039, 1045 (7th Cir. 2000); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir. 2000). Moreover, there is no evidence in the record that Martino actually applied for openings on Higley's team. *See id.* (failure to hire claim requires plaintiff to apply for position). As such, the Court evaluates Higley's alleged comments under the standard set forth in *Hemsworth* as they pertain to Martino's termination pursuant to the RIF. *See Hemsworth,* 476 F.3d at 491.

As discussed above, Rumstein put Martino on the RIF short list and Franklin ultimately decided to terminated Martino's employment. Higley was not the relevant decision maker under the circumstances. In addition, Higley's statements were made after Martino's termination and there is no indication from the record that Higley's alleged comments were made in reference to Martino's discharge. *See Hemsworth*, 476 F.3d at 491. Accordingly, Martino's argument based on Higley's comments fails to establish direct evidence of age discrimination.

2.  **Suspicious Timing**

Next, Martino maintains that the timing of his termination is suspicious because it occurred after Gross asked him to take on additional sales responsibilities and Martino's

12

February 2006 positive performance review. *See Tubergen,* 517 F.3d at 473 ("Circumstantial evidence can come in the form of suspicious timing or behavior"). The evidence in the record reflects that Gross assigned Martino additional duties in July 2005, which was approximately one year before he was terminated. (*See* Pl.'s Stmt. Facts ¶ 9.) The twelve-month time period between Martino's July 2005 increased work duties and his termination, as well as the five-month time period from his performance review, are too attenuated to constitute "suspicious timing" that would raise an inference of discrimination. *Cf. Squibb v. Memorial Med. Ctr.,* 497 F.3d 775, 787 (7th Cir. 2007) (eight months between filing lawsuit and termination insufficient circumstantial evidence); *Culver v. Gorman & Co.,* 416 F.3d 540, 546-47 (7th Cir. 2005) (employer's ***sudden*** dissatisfaction with employee's performance may give rise to inference of discrimination). In short, Martino's July 2005 increased work duties and his performance review are too remote in time and context to link Martino's age to his discharge. Furthermore, Martino's written performance review that he received five months before his discharge is not relevant because "what matters in a discriminatory discharge case is not the employee's past performance, but whether she was meeting the company's expectations at the time of her discharge." *Johal v. Little Lady Foods, Inc.,* 434 F.3d 943, 946 (7th Cir. 2006) (citation omitted).

Martino also argues that the timing of his discharge was suspicious because he took on additional job responsibilities in June 2006, one month before his discharge. Specifically, in May 2006, Robert Weber transferred from IT Hosting Solutions to Premier Accounts. (Pl.'s Stmt. Facts ¶ 9; R. 63-1, Def.'s Resp. ¶ 9.) After Weber left IT Hosting Solutions, Gross asked Martino to assume responsibility for Weber's accounts. (*Id.*) Although the parties dispute the

extent to which Martino "took over" Weber's accounts, the additional job responsibilities do not lead to an inference of unlawful discrimination because this evidence does not "'point[] directly' to a discriminatory reason for the employer's action." *See Atanus v. Perry,* ___ F.3d ___, 2008 WL 696908 (7th Cir. Mar. 17, 2008); *Ptasznik,* 464 F.3d at 695. In addition, while "[t]here is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, ... it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact." *See Tomanovich v. City of Indianapolis,* 457 F.3d 656, 665 (7th Cir. 2006) (quoting *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 981 (7th Cir. 2004)). Accordingly, Martino's suspicious timing argument fails.

### 3. Suspicious Behavior

Martino also argues that he was qualified to go forward as a BSC after the RIF and that Verizon Business' suspicious behavior of retaining younger, non-performers "screams" age discrimination. *See Tubergen,* 517 F.3d at 473 (circumstantial evidence may include suspicious behavior). After the RIF, Verizon Business retained six BSCs who reported to Gross and who were younger than Martino at the time of his discharge (age 55). When a plaintiff and those allegedly favored over him are above the age of 40, the age difference must be ten years or greater to be presumptively substantial. *See id.* at 475 n.4; *Bennington v. Caterpillar, Inc.,* 275 F.3d 654, 659 (7th Cir. 2001). Accordingly, two of the six remaining BSCs who reported to Gross are not sufficient comparators – Greg Smidt (age 47) and Ray Jaeger (age 49) because they are less than ten years younger than Martino. (*See* Pl.'s Stmt. Facts ¶ 18.) Moreover, of the four remaining BSCs, two of them received higher 2005 performance reviews than Martino – Timothy Damato (age 44) and Jonathan Gagnon (age 37). (*See id.* ¶ 20.) That leaves one

individual younger than Martino who received the same 2005 performance review as Martino, but who Martino outperformed based on his percentage of sales from the BP Amoco deal – James Franke (age 38).[4] This evidence does not raise an inference of age discrimination, especially because Martino's sales numbers were skewed due to the BP Amoco deal. Also, Martino's argument does not take into consideration these individuals' ability to meet other performance-related criteria, such as their ability to sell complex managed services. On a final note, Rumstein's RIF list included six individuals besides Martino, all of whom were younger than Martino. (Def.'s Stmt. Facts. ¶ 43.) Thus, Martino's allegations of "suspicious behavior" do not support an inference of intentional age discrimination. *See Nichols,* 510 F.3d at 781.

Because Martino has failed to establish intentional age discrimination under the direct method of proof, the Court turns to the indirect method of proof.

B.      **Indirect Method**

Martino also argues that he can establish a prima facie case of age discrimination under the indirect method of proof. To establish a prima facie case of age discrimination under the indirect method of proof, Martino must show that (1) he is a member of a protected class, (2) his job performance met Verizon Business' legitimate expectations, (3) Verizon Business subjected him to an adverse employment action, and (4) Verizon Business treated similarly situated younger employees more favorably. *See Duncan v. Fleetwood Motor Homes of Ind., Inc.,* 518 F.3d 486, 491 (7th Cir. 2008); *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007). In ADEA claims and claims in the context of RIFs, the Seventh Circuit recognizes variations to the

---

[4] The 2005 performance appraisal for Nate Fox (age 32 or 33) is unavailable. (Pl.'s Stmt. Facts ¶ 20.)

15

fourth prima facie element, including, the employer "sought someone to perform the same work after he left," *see Duncan,* 518 F.3d at 491, or the plaintiff's "job duties were absorbed by employees who were not members of [his] protected class." *Hemsworth,* 476 F.3d at 492. If Martino fails to establish a prima facie case of age discrimination, summary judgment in Verizon Business' favor is appropriate. *See Henry v. Jones,* 507 F.3d 558, 564 (7th Cir. 2007).

The Court turns to the second element of Martino's prima facie case, namely, whether Martino's job performance met Verizon Business' legitimate expectations because it is dispositive. The proper inquiry under this element requires the Court to look at Martino's job performance through the eyes of his supervisors at the time of the RIF and his termination. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). Here, Rumstein explained that he considered various factors in deciding who to put on the RIF short list, including geographic coverage, the BSC's ability to sell Verizon Business' complete product portfolio, the BSC's credibility with the core sales organization, the BSC's past ability to sell across multiple services, and the BSC's actual sales performance. Rumstein further explained that despite Martino's high sales numbers from the BP Amoco deal, he put Martino on the RIF list because Martino had not demonstrated past success in selling complex managed services as opposed to collocation services. Specifically, Rumstein testified that Martino was not performing based on IT solutions' expectations to sell multiple services. Further, there is evidence in the record that going forward, BSCs would be required to sell multiple services and would not receive commissions for selling basic collocation services.

Moreover, Franklin explained that although Martino's qualified sales numbers were very good, the majority of his sales were due to the BP Amoco deal and that Martino did not

16

participate in the BP Amoco deal in a meaningful way.  Franklin also stated that Martino's track record as a BSC suggested that he had a limited ability to sell managed services and that the majority of his qualified sales consisted of basic collocation services.

Based on both Rumstein's and Franklin's assessments, Martino was not meeting Verizon Business' legitimate performance expectations at the time of the RIF and Martino's discharge. *See Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1056 (7th Cir. 2006) (employee's opinion that he performed to his employer's legitimate expectations is irrelevant).  Furthermore, although Martino presents evidence that his qualified sales numbers were high, meeting Verizon Business' expectations as to one aspect of his job does not establish that he was meeting Verizon Business' performance expectations as to every aspect of his job – especially because Verizon Business took other factors into consideration when choosing employees for the RIF.  *See Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 540 (7th Cir. 2007).

Because Martino has not presented evidence creating a genuine issue of material fact that he was meeting Verizon Business' legitimate performance expectations, he has failed to set forth a prima facie case of unlawful age discrimination under the ADEA.  *See Henry,* 507 F.3d at 564. The Court thereby grants Verizon Business' summary judgment motion as to Count I of the Amended Complaint.

**II.     Martino's State Law Claims**

Finally, the Court declines to exercise its supplemental jurisdiction over Martino's state law claims as alleged in Counts II through V of the Amended Complaint because the Court is dismissing Martino's claim over which the Court has original jurisdiction, namely, his claim pursuant to the Age Discrimination in Employment Act.  *See Ross v. Board of Educ. of Twp.*

*High Sch. Dist.*, 486 F.3d 279, 285 (7th Cir. 2007); 28 U.S.C. § 1367(c)(3). "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *East-Miller v. Lake County Highway Dep't,* 421 F.3d 558, 564-65 (7th Cir. 2005) (quoting *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir. 1999)). Section 1367(d) tolls the statute of limitations for 30 days after the Court's dismissal of these supplemental claims allowing Martino to timely file these claims in state court. *See Williams Elec. Games, Inc. v. Garrity,* 479 F.3d 904, 907 (7th Cir. 2007); *see also Segal v. Geisha NYC, LLC,* 517 F.3d 501, 506 (7th Cir. 2008). Accordingly, the Court dismisses Counts II through V of the Amended Complaint without prejudice.

## CONCLUSION

For these reasons, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's ADEA claim alleged in Count I of the Amended Complaint. The Court declines to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims, and thus dismisses Counts II through V of the Amended Complaint without prejudice. Finally, the Court denies Defendant's Motion to Strike as moot.

**Dated:** May 21, 2008

              **ENTERED**

              _____
              **AMY J. ST. EVE**
              **United States District Court Judge**